**Ex parte Franklin D. CHAMBERS**

**No. 94–0495.**

Supreme Court of Texas.

Argued Nov. 11, 1994.

Decided March 30, 1995.

Rehearing Overruled June 15, 1995.

Robert K. Frisch, Dallas.

Ray N. Donley, Jane M.N. Webre, Austin.

HIGHTOWER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, CORNYN, GAMMAGE, SPECTOR and OWEN, Justices, join.

In this case we must decide whether a judgment of contempt was properly rendered against a corporate officer, director and shareholder for his personal failure to cause the corporation to pay a contempt fine previously adjudged against it. Although we find that the order was sufficiently specific to give rise to a personal duty on Chambers' part to obey it, we grant his petition for writ of habeas corpus because we find that he has conclusively proven that the corporation was unable to comply with the order.

In early 1992, Franklin Delano Chambers was an employee of International Business Exchange Corporation (hereinafter "IBEC"), a corporation whose business consisted primarily of bringing together buyers and sellers of businesses through listings, mail outs and advertising. In connection with his employment, Chambers entered into an agreement in which he promised not to use IBEC's marketing tools and trade secrets in competition with IBEC. In April 1992, Chambers founded International Business Search, Inc. (hereinafter "IBS"). IBS employed Chambers and several other former IBEC employees to provide essentially the same business listing services which they had offered as employees of IBEC. Chambers, along with Donna Nicholls and Allan Millen, made up IBS's initial board of directors; however, Nicholls and Millen were removed from the board only two months after IBS

was formed. This left Chambers as the sole officer, director and 100% stockholder.

In mid 1992, believing that IBS and Chambers were unlawfully competing with it in violation of the nondisclosure and noncompetition agreements, IBEC sued IBS, Chambers, and the other former IBEC employees. Among the remedies sought by IBEC and granted by the trial court was an injunction to restrain the defendants from using or disclosing IBEC's trade secrets and confidential information. The injunctions granted by the trial court were subsequently and repeatedly violated.

On February 2, 1993, IBS and the individual defendants were found to be in contempt of court for violating the injunctions through customer contacts which occurred in July and August of 1992. Fines were ordered and were paid. During March of 1993, Chambers proceeded to shut down IBS and open a sole proprietorship called Investor Brokerage Service (hereinafter "IBS II"). The assets of IBS were transferred to IBS II, which used the same location, the same phone number, and engaged in the same business as IBS. On June 24, 1993, the defendants were again found to be in violation of the trial court's injunctions stemming from customer contacts in September, November and December of 1992. On this occasion, however, only IBS was held in contempt. For these multiple acts of contempt, IBS, of which Chambers was the sole officer, director and shareholder, was ordered to pay a $3000 fine within seven days.

One hundred fifteen days later, the fine from the second contempt judgment against IBS remained unpaid and *Chambers* was ordered to show cause why *he* should not be held in contempt for the failure of *IBS* to pay the fine. At the show cause hearing, Chambers contended that IBS was unable to pay the fine. Chambers and IBS were both found to be in contempt of court. Chambers, individually, was ordered to pay a total fine of $6000 and was sentenced to jail for a period of 7 days and for so long thereafter as the $6000 fine remained unpaid.

Chambers sought a writ of habeas corpus from the Third Court of Appeals, which writ was ultimately denied by that court. —— S.W.2d ——. We initially granted Chambers' release on bond while his application was pending, and we now grant the writ of habeas corpus because Chambers has established the corporation was unable to pay the court ordered fine.

## I.

 We must first decide whether Chambers, a corporate officer and director, can be held in contempt of court when the violated order is directed only to the corporation. Contempt of court is broadly defined as disobedience to or disrespect of a court by acting in opposition to its authority. *Ex parte Norton,* 144 Tex. 445, 191 S.W.2d 713, 714 (1946). *See also* William W. Kilgarlin & Scott A. Ozmun, *Contempt of Court in Texas—What You Shouldn't Say to the Judge,* 38 Baylor L.Rev. 291, 292 (1986). Within this definition, there are two basic types of contempt: direct contempt and constructive contempt. Direct contempt is that type of disobedience or disrespect which occurs within the presence of the court, while constructive contempt occurs outside the court's presence. *Ex Parte Gordon,* 584 S.W.2d 686, 688 (Tex.1979). The contempt alleged in this case, violation of a written court order, outside the presence of the court, is constructive contempt. A criminal contempt conviction for disobedience to a court order requires proof beyond a reasonable doubt of: (1) a reasonably specific order; (2) a violation of the order; and (3) the willful intent to violate the order. *See In the Matter of Hipp, Inc.,* 5 F.3d 109, 112 (5th Cir.1993) (citing *Cooper v. Texaco, Inc.,* 961 F.2d 71, 72 n. 3 (5th Cir. 1992); *United States v. Burstyn,* 878 F.2d 1322 (11th Cir.1989)).[1] In reviewing the record, we are without jurisdiction to weigh the proof and determine whether it preponderates for or against the relator; rather, we determine only if the judgment is void because, for example, the relator has been confined without a hearing or with no evidence

---

1. The federal authority cited more clearly sets out the elements of proof for a criminal contempt case than some of our state jurisprudence; however, as will be demonstrated in the following paragraphs, the requirements under Texas law are functionally the same.

of contempt to support his confinement. *Ex parte Barnett*, 600 S.W.2d 252 (Tex.1980); *Ex parte Helms*, 152 Tex. 480, 259 S.W.2d 184 (1953). *See also Ex parte Howell*, 843 S.W.2d 241, 245 (Tex.App.—Houston [1st Dist.] 1992, orig. proceeding).

### A.

■■■ We first consider whether the order Chambers is accused of violating is sufficiently specific to support a judgment of contempt. The order which Chambers is charged with violating is an order directing IBS to pay a $3000 fine, but it does not designate any particular person to carry out its terms. In order to support a judgment of contempt, Texas law requires that the underlying decree set forth the terms of compliance in clear, specific and unambiguous terms so that the person charged with obeying the decree will readily know exactly what duties and obligations are imposed upon him. *Ex parte MacCallum*, 807 S.W.2d 729, 730 (Tex.1991); *Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex.1981); *Ex parte Slavin*, 412 S.W.2d 43, 44 (Tex.1967). Chambers argues that nonpayment by the corporation cannot result in *his own* contempt because the court did not clearly and unambiguously order *him* to pay the fine. We disagree.

A court order is insufficient to support a judgment of contempt only if its interpretation requires inferences or conclusions about which *reasonable* persons might differ. *MacCallum*, 807 S.W.2d at 730. Only the existence of *reasonable* alternative constructions will prevent enforcement of the order. *See, e.g., Ex parte Crawford*, 684 S.W.2d 124 (Tex.App.—Houston [14th Dist.] 1984, orig. proceeding) (holding an obligor in contempt who knew with certainty he was to pay one of two amounts of child support but ignored the order altogether). The order need not be full of superfluous terms and specifications adequate to counter any flight of fancy a

contemnor may imagine in order to declare it vague. *Ex parte Johns*, 807 S.W.2d 768, 774 (Tex.App.—Dallas, 1991).

There is no question in this case which corporation was responsible for paying the court ordered fine. Further, there is no ambiguity concerning the amount of the fine ordered or when it was due. The only issue is whether it was reasonable to conclude that IBS was required to pay the fine, but that it would do so without human intervention. The absurdity of the question provides its own answer.

■■■ Although a corporation is a legally distinct and cognizable entity, it is only able to act through its agents. *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 156 Tex. 7, 291 S.W.2d 697, 699 (1956). Since a corporation is capable of violating a court order only if *its agents* act or refrain from acting, it follows that an order directed at a corporation is binding on agents authorized to act on its behalf, whether specifically named in the order or not. *See, e.g., Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (order directed at corporation only but president held in contempt); *United States v. Laurins*, 857 F.2d 529 (9th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (order directed at corporation and vice-president but managing director held in contempt). *See also* Charles R.P. Keating, Fletcher Cyclopedia of Corporations § 5073 (Perm. ed. 1986). There can be no doubt that a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. *Wilson*, 221 U.S. at 376, 31 S.Ct. at 542–43. Were this not true, entities could delegate their disobedience to physical actors who, since they would be beyond judicial power, would have no reason to recognize or obey it.[2]

---

2. Similar concerns are present in the aider and abettor context. A court's order has no power at all if it may be flaunted by a proxy acting in contempt of the court's authority. Therefore: [A] decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence ... defendants may not nullify a de-

cree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding. *Waffenschmidt v. Mackay*, 763 F.2d 711 (5th Cir. 1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986) (quoting *Regal Knitwear Co. v. Nat'l Labor Relations Board*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945)).

■ Simply because *a corporation* has failed to comply with a court order, it does not necessarily follow that all corporate agents or officers are in contempt because of their agent status. There must be evidence in the record that the corporate agent charged with contempt was somehow *personally* connected with defying the authority of the court or disobeying its lawful decrees. *See, e.g., Deramus v. Thornton*, 160 Tex. 494, 333 S.W.2d 824 (1960). We have previously refused to uphold a judgment of contempt against a corporate president because of the absence of any evidence that the president had either encouraged or participated in the violations of injunctions carried out by other employees. *Id.* at 828–30. However, when an agent of the corporation, having knowledge of an order directed at the corporation, participates in or encourages the violation of that order, that agent may be individually held in contempt of court.[3]

The record indicates that Chambers was IBS's only officer, its only director, and indeed, its only shareholder. It is also undisputed that Chambers was present when the trial court ordered IBS to pay the initial contempt fine. Since Chambers was the *only* person capable of compelling IBS to pay the court ordered fine, it is clear that IBS's disobedience is due to Chambers' *personal* refusal to act. Thus, since the order to IBS is binding on Chambers, and since the trial court heard evidence that Chambers personally participated in its violation with notice of the order, the judgment of contempt is not void on these grounds.

### B.

■ We now consider whether Chambers willfully violated the court's order. Chambers argues that there is no evidence that he violated the court's order knowingly and intentionally. Although at times not clearly enunciated in Texas case law, the require-

ment of willful disobedience is a necessary consequence of the accumulated contempt jurisprudence. As explained above, to support a judgment of contempt, the underlying order must be clear and unambiguous. *MacCallum*, 807 S.W.2d at 730. In addition, one must have knowledge or notice of an order which one is charged with violating before a judgment of contempt will obtain. *See, e.g., Ex parte Conway*, 419 S.W.2d 827, 828 (Tex. 1967). Noncompliance with an unambiguous order of which one has notice will ordinarily raise an inference that the noncompliance was willful.

■ It is uncontested in this case that Chambers was present when the trial court ordered IBS to pay the contempt fine. It is also clear that Chambers and Chambers alone is responsible for IBS' disobedience. Although Chambers argues that he did not willfully violate the order because he acted on the advice of his attorney, this argument is unavailing. While reliance upon the advice of counsel may be considered in mitigation of contempt, it does not constitute a defense. *Edrington v. Pridham*, 65 Tex. 612, 617 (1886). *See also S.E.C. v. First Financial Group, Inc.*, 659 F.2d 660 (5th Cir.1981).

■ The analysis above does not end our inquiry concerning Chamber's alleged willfulness. The involuntary inability to comply with an order is a valid defense to criminal contempt, for one's noncompliance cannot have been willful if the failure to comply was involuntary. *See Ex parte Rohleder*, 424 S.W.2d 891, 892 (Tex.1967); *Ex parte Kollenborn*, 154 Tex. 223, 276 S.W.2d 251, 253–54 (1955). Although the inability to comply defense technically rebuts the willfulness element of contempt liability, the relator bears the burden of proving his inability to comply. *See, e.g., Kollenborn*, 276 S.W.2d at 254. Again, we do not weigh the evidence, but

---

3. *See, e.g., State ex rel. Grimsley v. West Lake Development, Inc.*, 71 N.C.App. 779, 323 S.E.2d 448 (1984), *review denied*, 313 N.C. 514, 329 S.E.2d 401 (1985) (upholding contempt judgment against general manager where court order concerning sedimentation and erosion control was directed solely at the corporation and it was stipulated that the general manager had notice of the order and was responsible for sedimentation

and erosion control); *Department of Revenue v. Carpet Warehouse, Inc.*, 296 Or. 400, 676 P.2d 299 (1984) (upholding contempt judgment against corporate president for failure of corporation to file tax return as ordered). *See also* 10A Charles R.P. Keating, Fletcher Cyclopedia of the law of Private Corporations § 5073 (Perm. ed. 1986).

only determine if there is no evidence to legitimize the relator's confinement. *Ex parte Barnett*, 600 S.W.2d 252 (Tex.1980); *Ex parte Helms*, 152 Tex. 480, 259 S.W.2d 184 (1953). *See also Ex parte Howell*, 843 S.W.2d 241, 245 (Tex.App.—Houston [1st Dist.] 1992, orig. proceeding). Thus, the issue in habeas corpus review is whether the relator has conclusively established that IBS was involuntarily unable to pay. Chambers argues that he has conclusively established this defense, and we agree.

■ It is undisputed that IBS did not have sufficient assets to pay the fine at any point subsequent to the date on which the fine was ordered. In point of fact, IBS had ceased doing business altogether. IBS could not have paid the fine even if Chambers had acted.

One month after the first series of fines, IBS ceased doing business and Chambers continued providing the same services in the form of a sole proprietorship, IBS II. The assets of IBS were transferred to IBS II, which took up residence in the same office space and used the same telephone number as IBS. IBEC points to this evidence and argues that Chambers has not conclusively proven IBS was *involuntarily* unable to pay the fine, but that IBS's inability to pay was purposefully achieved. We must disagree.

■ The shifting of assets from IBS to IBS II occurred prior to the imposition of the court-ordered fine. A contemnor cannot be held in constructive contempt of court for actions taken prior to the time that the court's order is reduced to writing. *See Ex Parte Price*, 741 S.W.2d 366 (Tex.1987). Chambers had no duty to preserve IBS assets for the payment of fines to be ordered in the future; therefore, his actions, taken alone, prior to the issuance of the fine, do not raise any inference that he was seeking to avoid the contempt powers of the trial court.

■ IBEC further argues that the assets of IBS II ought to be included in determining whether IBS, which it considers to be Chambers' alter ego, was capable of paying the fine when ordered. We need not determine whether Chambers' personal assets ought to be included in determining IBS's

ability to comply because this was not the basis of the motion for contempt below. IBEC, in its motion for contempt, sought only to hold Chambers accountable for his own failure to make IBS act. Nowhere did IBEC allege that IBS was Chambers' alter ego. Full and unambiguous notice of the accusation of contempt must be served on the alleged contemnor. *Ex Parte Adell*, 769 S.W.2d 521 (Tex.1989). We cannot justify Chambers' imprisonment on a basis which is not alleged in the respondent's sworn motion for contempt, but rather is raised for the first time when Chambers seeks his freedom through writ of habeas corpus.

The dissent makes much of the fact that the only reason IBS lacked sufficient assets to pay its fine is because, before the fine issued, Chambers transferred them out of the corporation and into his own pocket. The effect of this position is to require IBS to stay in business solely to pay fines which hypothetically would be levied in the future. We believe that meaningful review of the "inability to comply" defense is more readily accomplished by limiting the contemnor's burden to proving that the corporation lacked sufficient assets (or access to assets) to pay the fine at all times after the fine was entered. If the opposition wishes to prove that pre-fine transfers were fraudulent or that the corporate form was being used as a sham to perpetrate a fraud, it should be their burden to so allege and so prove.

Since we find that Chambers has established IBS's inability to comply defense, it is unnecessary to address his remaining points. We therefore grant Chambers' petition for writ of habeas corpus and order that he be discharged from custody.

ENOCH, Justice, concurring.

I agree that the petition for writ of habeas corpus should be granted in this matter, but for reasons other than those expressed by the Court. Specifically, I disagree with the Court that a corporate agent may be held in contempt of court for the corporation's violation of an order directed only against the corporation. Because the order did not specifically name Chambers or direct him to take any action on behalf of the corporation,

the order lacks specificity and cannot support a contempt judgment against Chambers. As the contempt judgment against Chambers is void, I concur in the Court's judgment granting the petition for writ of habeas corpus.

In this case, the June 24, 1993 judgment of contempt (and the order incorporated therein) unambiguously directed that the corporation pay $3,000 to the clerk of the court during the period from June 24th to July 1st. The order did not require the corporation to generate the funds necessary to pay the fine or restrict the transfer of any assets or operations. The order did not include any direction to Chambers or any of the other individual defendants, as had previous orders in the case. The trial court could have directed the actions of the corporation and the individual defendants, but it did not.

A corporation is a separate legal entity, and "[t]he corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations." *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1987). We disregard the corporate form in only two situations. First, when "the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Id.* In that situation, the corporation is considered the alter ego of the individual, and the two are treated as one. Second, we ignore the corporate form when we hold corporate representatives personally liable for the consequences of their own wrongful acts, even when those acts are performed in the corporation's name and within the scope of their authority. This exception exists in negligence and criminal law. *Leyendecker & Assoc., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984); TEX.PENAL CODE § 7.23. In that situation, the penalties for the wrongful deeds can be imposed on the corporation, the individual, or both.

By determining that the June 24, 1993 judgment of contempt unambiguously ordered Chambers to comply with its terms, the Court has in effect determined that the corporation was Chambers' alter ego or that he committed a tortious or criminal act. To allow this Court or the trial court to make that determination for the first time in a contempt hearing raises serious questions of whether Chambers was given proper notice of the charges against him before he was subjected to incarceration and a fine.

It is an accepted rule of law that for a person to be held in contempt for disobeying a court decree, the decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him.

*Ex parte Slavin,* 412 S.W.2d 43, 44 (Tex. 1967). In this case, the trial court failed to issue an order of sufficient scope to sustain its contempt judgment against Chambers; it failed to order Chambers to do or not do anything at all. The initial judgment of contempt, issued in January 1993, rightfully imposed fines on both the corporation and the individual defendants. The June 1993 judgment of contempt, however, was limited to the corporation alone. More than anything else, this omission is responsible for whatever miscarriage of justice would occur by relieving Chambers of the contempt penalties here. We should not distort the substantive law of contempt to remedy such an oversight.

Because I would hold the contempt judgment against Chambers void, I concur in the judgment granting the petition for writ of habeas corpus.

GONZALEZ, Justice, dissenting.

I will not join an opinion that allows Chambers to continue brazenly flouting the orders of the trial court, thus making a mockery of the judicial system. Chambers has repeatedly ignored the trial court's injunctions. It was only after the trial court held him in contempt for the second time that it assessed the penalty (seven days in jail and a $6,000 fine) that he presently challenges. Because Chambers willfully failed to comply with the trial court's order and voluntarily rendered himself unable to comply with the order, I would deny his writ of habeas corpus.

This case arises out of a lawsuit to protect the International Business Exchange Corporation's (IBEC's) customer and buyer lists from misuse by ex-employees. When IBEC hired Chambers, he agreed not to use any

information and methods learned at IBEC to compete with IBEC for one year following the termination of his employment. When Chambers left IBEC and set up a competing business, International Business Search (IBS), he immediately began using IBEC's information and customer lists for his own company's benefit. IBEC commenced judicial proceedings to enforce its non-compete agreement with Chambers.

A brief summary of the events that followed shows the utter contempt Chambers displayed toward the trial court:

April 9, 1992 Chambers incorporated IBS to compete with IBEC.

June 1992 After removing former IBEC employees from the IBS board, Chambers became the sole officer, director, and shareholder of IBS.

July 15, 1992 First restraining order.
The trial court issued a temporary restraining order (TRO) ordering Chambers and IBS not to use IBEC's customer leads, not to mail letters "very similar to" IBEC's customer solicitation letters, and not to use or disclose any of IBEC's confidential information.

August 19, 1992 Amended restraining order.
After notice and an evidentiary hearing which Chambers and his attorney attended, the trial court concluded that Chambers and IBS intended to use IBEC's customer information and marketing tools to compete with IBEC in violation of the agreement not to compete. It amended the TRO to clarify that the order prohibited these activities.

January 4, 1993 Second TRO.
The trial court found that IBS was contacting former and current IBEC customers and making defamatory statements about IBEC and "fomenting spurious litigation." The court enjoined IBS from contacting IBEC's customers.

January 15, 1993 The trial court made the January 4, 1993 TRO into a permanent restraining order.

February 2, 1993 First contempt judgment.
The trial court held Chambers and IBS in contempt of court for violating the amended TRO, after finding numerous instances in which Chambers had contacted IBEC's customers. It fined Chambers $350 and IBS $700.

March 1993 Chambers began doing business as Investors Brokerage Service (IBS–2) as a sole proprietorship. IBS–2 occupied the same office space as IBS, retained the same phone number, and continued IBS's lease payments on Chambers' car. Chambers drained cash reserves from the first company, IBS, leaving it with cash reserves of only $11,488.

June 8, 1993 The day before the hearing on IBEC's second motion for contempt, Chambers withdrew the last $209.22 from the IBS bank account.

June 24, 1993 Second contempt order.
The trial court held IBS in contempt for six violations of prior restraining orders, and fined it $3,000. It ordered the sanction paid within seven days of the judgment. Neither IBS nor Chambers paid the fine.

October 25, 1993 — <u>Third judgment of contempt and order of commitment.</u>
The trial court held IBS and Chambers, as its sole officer, director, and shareholder, in contempt. It ordered the sheriff to take custody of Chambers and to place him in the county jail for seven days' imprisonment. The trial court also fined Chambers individually $6,000.

---

Three days later, Chambers petitioned the court of appeals for a writ of habeas corpus. The court of appeals held the contempt judgment to be both civil and criminal in nature because it punished Chambers for failing to see that IBS's fine was timely paid, and coerced him to pay his own fine by incarcerating him until such time as it was paid. —— S.W.2d ——, ——. It further determined that the orders directing IBS to pay fines had the legal effect of commanding payment by the company's officers, in this case, Chambers alone. *Id.* at ——. Also, the court of appeals held that the trial court did not err in fining Chambers $6000 individually and in refusing to credit jail time toward satisfaction of the fine. Lastly, it ruled that the "purging provision" in the commitment order removed it from the statutory six-month limit for incarceration under order of contempt in Section 21.002 of the Texas Government Code.

We initially granted Chambers' release on bond while his application for writ of habeas corpus was pending. This Court today grants relief and issues the writ. However, I would overrule the application for writ of habeas corpus and remand Chambers to the custody of the Sheriff of Williamson County, to be confined until he serves his time and pays his fine.

## I.

In the trial court's second contempt order of June 24, 1993, the court enumerated six specific instances in which Chambers and IBS violated the court's prior restraining order. The trial court ordered IBS to pay a $3000 fine within seven days. Chambers argues that the order failed to set out the details of compliance in "clear, specific, and unambiguous terms" so that he would know that he was "obligated to pay or cause the corporation to pay the $3000 fine." He further claims that because no individual defendants other than IBS were found in con-

tempt, punished by fine, or ordered to take affirmative steps for paying the fine or causing it to be paid, he was not aware that he might be held accountable for IBS's failure to pay the fine. I disagree.

The decree underlying a judgment of contempt must set forth clear, specific, and unambiguous terms of compliance so that the person charged with obeying the decree will readily know exactly what duties and obligations it imposes. *Ex parte MacCallum,* 807 S.W.2d 729, 730 (Tex.1991). An order is insufficient if its interpretation requires inferences or conclusions about which reasonable minds could differ. *Id.* We should not review the order in this case in a vacuum. The issue is whether a reasonable person in Chambers' position would have concluded that the court's order imposed no duty upon him. Once apprised of an order directed to the corporation, if an agent responsible for the conduct of corporate affairs prevents compliance or fails to take appropriate action within his power and in fulfillment of his corporate duty, the agent, no less than the corporation itself, is guilty of disobedience and may be punished for contempt. *Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 542–43, 55 L.Ed. 771 (1911).

Admittedly, the trial court's third contempt order of October 25, 1993 most clearly holds Chambers in contempt for failing to require IBS to pay the fine. However, the second contempt order of June 24, 1993 would have indicated to a reasonable corporate officer in Chambers' place that not merely IBS alone was responsible for the fine. Chambers was IBS's sole officer, director, and shareholder. Chambers alone managed the day-to-day affairs of the company. For all intents and purposes, Chambers was IBS. He cannot claim he was surprised that the trial court would hold him accountable for IBS's failure to obey its contempt orders. Thus, Chambers willfully failed to comply with the trial court's orders. Be-

cause he is responsible, he may properly be held in criminal contempt.

## II.

Chambers argues that contempt is improper in this case because he established that IBS was unable to pay the court-imposed fines. Again, I disagree. He attempts to invoke an "involuntary inability" of the company to pay the $3,000 fine to excuse his own violations of the trial court's orders.

The movant for a contempt order has the burden of proving that the other party has willfully disobeyed the court's command. The "involuntary inability" defense technically rebuts the "willfulness" element on which the opposing party bears the burden of proof. Thus, the relator bears the burden of proving his inability to comply with a court order. *See Ex parte Kollenborn*, 154 Tex. 223, 276 S.W.2d 251, 254 (1955); *accord S.E.C. v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir.1993). Upon review of an order of contempt, we do not weigh the evidence but only examine it to determine if there is any evidence to legitimize the relator's confinement. *Ex parte Helms*, 152 Tex. 480, 259 S.W.2d 184, 186 (1953). Therefore, the issue in habeas corpus review is whether the relator has conclusively established that he was involuntarily unable to pay a fine because there is no evidence to the contrary.

Chambers has not established that IBS was *involuntarily* unable to pay the trial court's fine. At one time, IBS had sufficient assets to pay the $3,000 fine. Chambers caused IBS's alleged subsequent inability to pay the fine. He did so by ceasing IBS business operations, withdrawing all its cash reserves, and creating IBS–2, a twin business entity with identical operations.

Only an *involuntary* inability to comply with a court's order is a valid defense to contempt. *Ex parte Sanchez*, 703 S.W.2d 955, 959 (Tex.1986). In this case, I would hardly call IBS's inability to pay involuntary. Chambers, the sole corporate officer who was responsible for the company's obedience to a court order, transferred assets from the company to his own pockets or to another company. He shut down IBS's operations to start a new, yet nearly indistinguishable company,

solely to escape court sanction and to create an impoverished contemnor. There is no evidence Chambers cannot undo the situation he created. I remain convinced that he can be held in contempt under the record in this case.

## III.

I next consider whether the trial court exceeded its authority in ordering that Chambers pay a $6000 fine and that he be confined for seven days and for so long thereafter as the fine remains unpaid. Resolution of this issue turns on the distinction between civil contempt and criminal contempt.

The distinction does not depend on whether the underlying litigation is civil or criminal, but rather on the nature and purpose of the court's punishment. *See generally Ex parte Werblud*, 536 S.W.2d 542, 545–46 (Tex. 1976). The object of civil contempt is to coerce the contemnor to comply with some order of the court. *Id.* The court possesses the power to jail or to fine a contemnor. Imprisonment under a civil contempt order coerces compliance through the use of a "purging" provision. A contemnor "carries the keys of [his] prison in [his] own pocket," since he will be released upon obedience to the court's order. *Id.* at 545 (quoting *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966)); *see* Kilgarlin & Ozmun, *Contempt of Court in Texas—What You Shouldn't Say to the Judge*, 38 Baylor L.Rev. 291, 297 (1986).

Criminal contempt differs from civil contempt in both purpose and scope. A criminal contempt order vindicates the authority of the court. The court imprisons the contemnor to punish him for a completed act which affronted the dignity and authority of the court. *Werblud*, 536 S.W.2d at 545. In cases of criminal contempt, in which courts punish contemnors' past actions rather than coerce future compliance, the Legislature has limited the severity of the punishment. *See* Tex. Gov't Code § 21.002. However, these limitations do not circumscribe the court's authority to coerce future obedience to its lawful decrees through civil contempt. *See Ex parte Klugsberg*, 126 Tex. 225, 87 S.W.2d 465, 468 (1935).

## A.

Chambers argues that the proceedings in this case were solely civil in nature, yet the

trial court ordered only criminal punishment. This argument is without merit.

The trial court's order of commitment fined Chambers for his past disobedience and committed him to jail for an absolute period of seven days. This was an order of *criminal* contempt. Its duration is well within the six-month limit on incarceration set by the Legislature. *See* TEX. GOV'T CODE § 21.002. No subsequent obedience on Chambers' part permitted him to avoid serving seven days in jail or paying the fine. *Werblud,* 536 S.W.2d at 545. Once the seven days is served, the trial court's order directed that Chambers be jailed for so long as his fine remained unpaid. At this point, Chambers will hold the keys to his own prison: he can purge himself of contempt by paying the court-ordered fine. Therefore, the latter component of the court's order was an order of *civil* contempt. *Id.* The trial court may combine both civil and criminal contempt in one order. *Sanchez,* 703 S.W.2d at 957.

**B.**

Chambers also argues that the trial court impermissibly "pierced the corporate veil" by jailing an individual officer for the company's failure to pay a corporate debt. I disagree with Chambers on two grounds.

First, although Chambers' imprisonment arose in part from IBS's failure to pay the $3,000 fine, he was not "imprisoned for debt." TEX. CONST. art. I, § 18. When neither IBS nor its sole officer, director, and shareholder paid the fine, the trial court held Chambers in criminal contempt. The $6,000 fine, like the seven days' imprisonment, is a penalty owed to the sovereign authority for violation of the criminal law. It is not a debt, a monetary obligation owed to another party. *See* BLACK'S LAW DICTIONARY 363 (5th ed. 1974) (defining "debt").

The power to hold parties in contempt and to sanction non-compliance is an essential element of judicial independence and authority. *Ex parte Browne,* 543 S.W.2d 82, 86 (Tex.1976). Without this power, courts are merely boards of arbitration, whose judgments and decrees would be only advisory. Kilgarlin & Ozmun, *supra,* at 292–93 (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501–02, 55 L.Ed. 797 (1911). The framers of our state's constitutional prohibition on imprisonment for debt did not intend to prevent courts from coercing payment of lawfully-imposed monetary penalties for criminal contempt with imprisonment. *See Thompson v. State,* 557 S.W.2d 521, 524–25 (Tex.Crim.App.1977); *Dixon v. State,* 2 Tex. 481, 483 (1847). In 1847 this Court stated:

> The words "imprisonment for debt" have a well defined and well known meaning, and have never been understood or held to apply to criminal proceedings. *It is not to be supposed, and it will scarcely be contended, that it ever entered into the minds of the framers* of the Constitution that they were to be understood as having any application to the administration of the criminal laws; or that they were to have the effect to prevent the punishment of crimes.

*Dixon,* 2 Tex. at 482–83 (citations omitted and emphasis added).

Second, Chambers was not fined and imprisoned for an act or omission of IBS or any other corporate agent. The trial court held him in contempt for his own willful refusal to obey its orders. In the underlying lawsuit, *International Business Exchange Corp. v. International Business Search, Inc.,* No. 92–207–C368, the trial court held IBS in contempt for repeated disobedience of the restraining orders prohibiting breaches of the agreement not to compete with IBEC. The court first ordered IBS to pay a $700 fine, and upon further non-compliance, a $3,000 fine. Chambers, the only person who could have caused IBS to comply with these orders, willfully refused to do so. As a general rule, a person who willfully disobeys a valid court order is guilty of contempt. *Ex parte Hall,* 854 S.W.2d 656, 658 (Tex.1993). It requires no "veil piercing" to hold the sole corporate officer, director, and shareholder responsible for *his own, knowingly wrongful conduct. See Kinkler v. Jurica,* 84 Tex. 116, 19 S.W. 359, 360 (1892) (holding directors personally liable for their misconduct, and not as agents of the corporation). Thus, the corporate veil need not be pierced to find Chambers subject to contempt for his willful

refusal to comply with the court order directed at IBS.

### C.

Chambers next argues that the trial court's order of commitment was defective because it did not credit or off-set time he served in jail against the $6,000 fine. I disagree.

With regard to the criminal contempt portion of the order mandating an absolute seven days' imprisonment, Section 21.002 of the Texas Government Code contains the only statutory limitation on the trial court's power to punish for contempt. As stated, seven days' confinement is well within the power Section 21.002 grants to the trial court. With regard to the civil contempt portion of the order mandating confinement until the criminal fine is paid, Chambers carries the keys to his own jail cell. He is entitled to release from jail upon payment of $6,000. Once a person is lawfully confined for civil contempt, only the contemnor's stubborn willingness to remain in jail lengthens his confinement. Chambers has cited to no authority, and I am aware of none, which would require the trial court to give Chambers *two sets of keys:* one set which releases him upon payment, and another which releases him once he is confined for a time equivalent in value to the amount of the fine. In fact, this Court has stated that the statute authorizing good time credit "does not apply to coercive civil contempt orders." *Ex parte Acly,* 711 S.W.2d 627, 628 (Tex.1986) (discussing Tex. Rev.Civ.Stat. art. 5118a (repealed) (codified at Tex.Code Crim.P. art. 42.032)). Chambers' proposed "time served" credit would dilute the coercive power of civil contempt. *See Ex parte Harrison,* 741 S.W.2d 607, 609 (Tex.App.—Austin 1987, no writ).

### D.

Finally, Chambers argues that the $6000 fine exceeds the $500 limit placed upon trial court by Section 21.002 of the Texas Government Code. I disagree once more.

Courts have inherent power to find parties before them in contempt. *Ex parte Pryor,* 800 S.W.2d 511, 512 (Tex.1990); *see* Tex. Gov't Code Ann. § 21.001 (stating that courts have all necessary power to enforce lawful orders and to control proceedings). Moreover, courts have the power to fine a party for each of multiple infractions of a court's order. *Ex parte Genecov,* 143 Tex. 476, 186 S.W.2d 225, 226–27 (1945). Because a contemnor is entitled to know what acts or failures on his part subject him to punishment, *Ex parte Parr,* 505 S.W.2d 242, 245 (Tex.1974), punishment for more than one act within one proceeding is permissible only if the motion for contempt specifically sets out distinct and separate violations. *Ex parte Oliver,* 736 S.W.2d 277, 278 (Tex.App.—Fort Worth 1987, no writ).

In this case, the trial court issued the first TRO on July 15, 1992, and amended it on August 19, 1992. The trial court prohibited IBS and Chambers from using IBEC's customer lists, customer leads, buyer and seller lists, and other confidential information. In the month between the initial TRO and the amended restraining order, Chambers and IBS representatives violated the trial court's order at least six times by calling IBEC's customers and signing two of IBEC's customers to contracts with IBS. The trial court held IBS and Chambers in contempt of court and fined them for these violations in the first contempt order on February 2, 1993.

Chambers thereafter continued to defy the court. On December 22, 1992, Chambers faxed a letter to IBEC's president and counsel threatening to contact IBEC customers and expose IBEC's "fraudulent" practices. He claimed that "we are starting to work with anyone who ever listed a business with IBEC." Chambers then made at least seven calls to IBEC customers who, within a week, called IBEC threatening to sue IBEC based on Chambers' misrepresentations about IBEC's practices. Some of the customers who called were Chambers' former clients from when Chambers worked for IBEC. In response, IBEC moved for a new TRO, which the trial court granted against IBS on January 15, 1993.

IBEC later learned that IBS and Chambers had made additional contacts with IBEC's customers in violation of the trial court's amended restraining order of August

19, 1992. IBEC responded by moving a second time that they be held in contempt. The trial court granted the motion on June 24, 1993. In the second order of contempt, the trial court noted that IBS made six separate phone calls to different IBEC customers. Consequently, the trial court fined IBS $500 for each call and ordered the $3,000 fine paid within seven days.

Chambers' refusal to pay IBS's fine constituted a separate act of contempt. The fine went unpaid 115 days before IBEC moved to have IBS and Chambers held in contempt of court a **third** time on October 25, 1993. Chambers refused to pay the fine because IBS lacked sufficient funds and, during the 115–day period, Chambers filed for bankruptcy and disbanded IBS as a business. (However, Chambers found the financing and initiative during the same period to launch IBS–2, a mere shadow and clone of IBS.) At the contempt hearing, the trial court had to instruct Chambers several times to be more responsive and less sarcastic on cross-examination. Clearly, Chambers took the third contempt action against him and IBS no more seriously than he had taken the trial court's authority over him throughout the underlying suit.

The trial court found Chambers in contempt of court for each of the 115 days. It fined him $6000. Chambers displayed an utter lack of respect for the trial court throughout the proceedings. Given his multiple violations and flagrant disregard for the trial court's orders, I would hold the full $6,000 fine proper. The record of the case shows numerous instances of Chambers' disdain for the trial court. This fine was well within the trial court's inherent authority to fine a party for contempt of court. *See Pryor*, 800 S.W.2d at 512. Chambers "knew that if he violated this order he would be held accountable for his actions; and still, he wilfully affronted the dignity and authority of the court by engaging in prohibited sales." *Ex parte Griffin*, 682 S.W.2d 261, 264 (Tex. 1984) (Gonzalez, J., dissenting). I would therefore affirm the trial court's third judgment of contempt and order of confinement, and remand Chambers to the custody of the Sheriff of Williamson County to serve his seven-day sentence and to remain there for so long thereafter as his fine remains unpaid.